The first case this morning is 521-0305. Colleen Cadigan is the executive of the estate of Elizabeth Driscoll v. Johnson & Johnson & Johnson & Johnson & Johnson Consumer Incorporated. I have down that Paul Johnson is representing the appellant, is that correct? Yes, your honor. And Jessica Davidson is representing the appellee. Are you ready to proceed? Yes. All right, go ahead. May it please the court, members of the 5th District Appellate Court, my name is Paul Johnson. I'm from the St. Louis office of the Driscoll firm PC. And our office had the privilege of representing Colleen Cadigan as executive of the estate of Elizabeth Driscoll v. Johnson & Johnson. In July of 2021, there was a three to four week trial that ended in a defense verdict. After two weeks of testimony, as the plaintiff rested on Friday, July 23, and Johnson & Johnson began their case on that same day with the face of the corporation, Dr. Susan Mickelson testifying, The appellant, the plaintiff learned for the first time after the lunch break on that date that it was the intention of Dr. Susan Mickelson, that face of the company corporate witness, who had testified before regulatory bodies in Congress and in civil trials around the country on talcum powder ovarian cancer cases, that she did not intend to come back on that following Monday, July 27, to finish her cross-examination. The trial judge, Judge Colker, interviewed Dr. Mickelson privately and assured the plaintiff's trial team, and frankly, the Johnson & Johnson team, that in that private discussion, it was agreed that Dr. Mickelson would come back on Monday to finish her cross-examination. On Sunday evening, July 26, at about 10 p.m., the parties received an email from Judge Colker, the trial judge, advising that for various reasons, that it was anticipated that because of now a medical reason affecting Dr. Mickelson, that she would not appear in court on that following Monday morning, July 26, to finish cross-examination. At the close of the evidence on Friday, there was a concern registered by Mickelson privately to Judge Colker, that she had a friend that was in apparent health matters and discretion. The trial court struck her testimony, right? That's correct. And then you wanted to cross. How can you cross what doesn't exist? Why should you have the right to do that? Yes, Your Honor, and to be candid with Your Honors of the Fifth District, if that's the decision of this reviewing body, if we go by acknowledged to be longstanding law, that when a court strikes testimony, it's as if it never existed, then we lose this appeal. However, as our trial team pointed out immediately, without waiting, without, you know, sitting on our hands and sitting on our rights, we asserted right away, but Judge Colker, it's smack dab in the middle of the hearts and minds of this jury, 144 minutes of direct, slick, PowerPoint-aided presentation with the big computer screen, it was in their minds. And the trial team reminded Judge Colker right away, it's in their minds. And so what the trial judge did was, eventually on that Monday, to advise the testimony's stricken. You're to pretend it doesn't exist like you just pointed out. But when we advised the Judge Colker that it's smack in the middle of their minds, he said, put together a proffer of cross-examination questions, along with the exhibits that you were going to use, and announced in front of the jury, I want the plaintiff to put together these questions, these proffer of cross-examination questions and exhibits, and present them to the jury. And the jury heard this. And so... The case law isn't it clear that it says the jury is presented to follow a judge's instruction? Yes, as I said a moment ago, candidly, and I'm not going to hide the ball from your justices of this appellate court. We all know what the law is. However, we pointed out in our briefing, the United States Supreme Court, Judge Learned Hand, and the Illinois Supreme Court has pointed out the fiction that we all know that that is, despite acknowledging openly to you, that that is the long-standing law in the state of Illinois, that if a trial judge says to a jury, disregard, strike this testimony as if it never happened, then the presumption is in long-standing law, I suspect in all 50 states, that that is the law. Basically, you can't unring the bell. The jury is your... Yes. Yes. And I would point out as well at this moment in our discussion, and that is, in the civil context, we're as close as you can get to a fundamental right, a due process type of right, that is to have an ordinary citizen, the estate of an ordinary citizen, attempt to cross-examine live the face of a corporate litigant, in this case a Fortune 500 company, the Johnson & Johnson companies. And to those of us that were there on the ground and seeing in real time what happened with the Nicholson scenario, it was outrageous, it was egregious, it was intentional, and it was prevarication, I believe. And so did the trial judge. The trial judge made observations that are part of this record, that for all her anxiety and medical this and medical that about concerns for COVID, saw her walking around the courthouse without a mask, going into the public restrooms without a mask, and so on. This was, to make no mistake about it, intentionally avoiding the continued cross-examination on that following Monday. Even if I'm not recalling it, but the record in this case was, I think, 13,000 pages or some astronomical number. What did you ask for at trial? Did you ask for a mistrial then, or what did you ask for at trial? We did not ask for a mistrial. So what remedy did you seek at trial? Well, before we could suggest our suggested sanctions, which included striking of the defenses and not allowing another corporate witness, Edward Kuffner, to testify, to not allow their toxicologist, Onan, to testify, we didn't have a chance to suggest those when the court just blurted out, well, I'm going to strike her testimony and I'm going to issue a 501 missing witness instruction. But we really were reacting to the admittedly impetuous pronouncement of the trial judge who was logically and legitimately upset and very upset and very mad at this affront on his authority, affront on the court's authority. The 501 instruction being the instruction that you're to presume that the testimony would have been negative or negative connotations for them not appearing. That's correct. He did give that instruction that Nicholson was under the control of Johnson & Johnson Companies, that she did not show up despite being ordered to do so, and yes, with all the elements of the 501. We realized, and I'm not hiding the ball at all here, we realized that this is an uphill battle for the appellant. However, we fit within the two requirements here, I believe, for the plein air doctrine to apply to this Nicholson scenario, and that is a real denial of a fundamental right in civil litigation to cross-examine the face of the company Fortune 500 corporate witness, Dr. Susan Nicholson, on one hand, and secondly, the no-show, as we saw it in real time in St. Clair County Courthouse, was an affront to the judicial system, to the judicial process, just thumbing the corporate nose at the St. Clair County Circuit Court system, and specifically Judge Colker himself. Which is why they were held in contempt. They were held in contempt, but as I pointed out in the briefing, that's, I believe, more or less the court's remedy to uphold the integrity of the court system. But that is not necessarily one of the sanctions that we believe would have put us in a better position than we were put in, which is not being able to cross-examine live the corporate face, Dr. Susan Nicholson. By the way, when we did have a limited opportunity on Friday, July 23rd, to cross-examine Dr. Nicholson, a close and fair reading of the 89 pages of transcript for that limited time period, it was pulling teeth, gut-wrenching, just to get a yes or no answer to a simple question. So the position that we were put in, ironically, by the striking of the testimony, without an opportunity to really discuss, on the record, other sanctions, other available remedies that would have put us in a better position, the judge just made his pronouncement about the 501 and striking the testimony. We believe that this is something that this court can adjust. We believe under Illinois Supreme Court Rule 366 that this court can enter any order that ought to have been given or made at the trial court level, whether this court decides there is forfeiture or waiver or not. And in the cause of fairness, in the cause of not allowing a corporate witness and her employer to thumb their nose at the judicial system here in the state of Illinois, like they did in real time in late July of 2021, we are respectfully and humbly requesting that the court intervene here and order a new trial for the appellate in this case. Thank you. Questions? Justice McCain? I do have one. You mentioned in passing that the court indicated you may have an opportunity for a proffer. I don't recall from the record that that was ever brought up again. Was that brought up again by the plaintiff? It was brought up. We made a record during a break in the trial proceedings, and Ms. O'Dell made a detail, I think it took 35 minutes just to present into the record the questions that would have been posed, the exhibits that would have been used. And after the trial judge announced publicly to the jury this proffer would be given in whatever format the court would allow, it was never allowed to happen. And that had to confuse the jury even more. Where is this ostensible cross-examination? Maybe I didn't make my question as clear as I wanted it to be. That's what I'm talking about. At that point, did the plaintiff ever bring that back to the court's attention? I could not find anything on the record in the transcript saying that, Your Honor. All right. Thank you. Thank you. All right. Thank you. We'll give an opportunity for a vote shortly. Thanks, and you're ready to proceed. Good morning, Your Honors. Good morning. Please report. My name is Jessica Davidson. I'm here on behalf of the Appellee G&J. I want to make clear that if I step back, is it better with the feedback? I want to make clear that what happened on the Sunday night that we've been discussing at this trial was really unfortunate. No trial lawyer wants to find out on a Sunday that a witness is not coming back Monday. It was a bad situation. There is no other way to describe it. But we did everything in our power to prevent that from happening. And Judge Colbert, the question here today is, did Judge Colbert abuse his discretion when he issued pretty devastating sanctions against J&J for what happened? The first thing Judge Colbert did was he told jurors that both J&J and Dr. Nicholson were in contempt. The second thing he did was he struck her testimony. And the third thing he did was he issued the 5.01 instruction. And I think it's very important, given some of the questions that Your Honors have been asking this morning, to talk about how plaintiffs reacted to this at trial. Because, and understandably so, plaintiffs thought this was their ticket to a plaintiff verdict. These were devastating sanctions, like really, really painful sanctions for the defendant. And plaintiffs capitalized on that in their closing argument. And I want to read what plaintiffs told the jurors because I think it's quite important. This is what was said in the closing. Number one, Dr. Nicholson was scared to death to come back. Number two, the court is going to instruct you that you can infer that her failure to appear, her violation of the order, means that her testimony likely was going to be favorable to the plaintiff. That's the law. There's an inference in favor of the plaintiff as a result of the violation. So plaintiffs jumped on the bandwagon of these sanctions, told the jurors, actually went beyond 5.01, right, because 5.01 says you may infer, told the jurors, the testimony likely was going to be favorable to the plaintiff. That's the law. And we're frankly quite happy with how this was all playing out until there was a defense verdict. And once there was a defense verdict, plaintiffs changed their views as to whether the court had acted properly. And I think that falls right into Illinois law about how you can't blow hot and cold in response to a court's actions, right? If you want to appeal something, you really have to preserve it. And one of the questions Your Honors asked this morning was did you guys move for a mistrial? We're the ones who moved for the mistrial. We moved for the mistrial because Judge Colker said plaintiffs in their closing can say all these things about Dr. Nicholson, how she was scared to death to come back and how, you know, her absence means that, you know, the cross-exam was likely going to be favorable to us, but J&J cannot respond. J&J was not allowed to put any evidence on the record about why she didn't come back, about her psychiatric condition over the weekend, about what her doctor said. We tried to bring a doctor in. We tried to provide an affidavit from the doctor. We tried every which way to put either before the court or the jury what had happened over the weekend, why this had, like, gotten to such a state that Dr. Nicholson was not willing to return, was not able to return, and we were not able to do that. And I do want to say that what happened on Friday was the judge told Dr. Nicholson, if you don't agree to come back Monday, I'm going to put you in prison, county housing. And Judge Nicholson, Dr. Nicholson's mental health did, as we were told, by a physician. And she did see multiple physicians. Her mental health did decline over the weekend. This was not something that we could have prevented. And the whole, you know, as your honors know, the goal of a trial is to finish it. And so Judge Colcord did every single thing possible to compensate for what happened without just, like, ending the trial and, you know, starting over. Which played the part. It ended up Friday. My understanding is, I think it's in one of the briefs, was that J&J requested that Dr. Nicholson be allowed to do her cross-examination remotely, not in person, but remotely, and that was denied. Was that explored again when she didn't show up on Monday? Was there talk about a continuum? Let's do this remotely since she's not doing this remotely, or did it jump directly to striking her testimony? One of the many requests that J&J did make after Dr. Nicholson failed to appear was to continue her cross-exam on Zoom the following Thursday. And that was denied. And I want to point out two things. Number one, under Pickering v. Owens Corning, this Court has held it's not our function to substitute our judgment for that of the trial court. So putting aside what I think are very serious invited error and waiver issues, even if you put all that aside and you assume that this was preserved, the question before this Court is whether Judge Colbert acted outside of whether he abused his discretion. Not whether there's a different way a different judge might have handled this, but whether he abused his discretion. And I think it's also important to understand that under Serpi v. Yellow Cab from the Fourth District, sanctions are not supposed to be a punishment. Sanctions are supposed to recreate a level playing field. And so we're in an odd situation here because, yes, J&J prevailed at trial, and I want to talk in a minute about why. But the sanctions were very severe. So it's not as though more sanctions would have leveled the playing field. More sanctions would have just put the scales even heavier and played a favor. And so I understand here I am telling you these sanctions were devastating, and yet somehow we won the trial. And I think it's important to understand why, because it goes to the question of even if this were an error, why it would have been harmless. Here was the fundamental problem at this trial. The witness lived alone. The decedent lived alone. The decedent was a pretty solitary person. She had never been married. Her family did not live with her. And one of the most important things that plaintiffs had to prove at this trial was that the decedent had actually used Johnson's baby powder in her underwear and for a sustained period of time, because plaintiffs' own experts said you need a lot of use of this product to allegedly cause cancer. And there was only the flimsiest product ID imaginable at this trial. Basically, the product ID evidence was the decedent's younger sister testified that she had 15 years earlier seen the decedent in the early morning using Johnson's baby powder. But then on cross-exam, she revealed that she had actually been asleep when her sister got ready for work in the morning. So that product ID evidence was discredited. The only other product ID evidence the plaintiff had was that the nephew recalled that 15 years earlier, he had gone to Walgreens with his aunt and purchased talc and a candy bar. Obviously, the nephew doesn't know how the talc was used, for whom it was used. In fact, there was evidence that the decedent had used talc to change a diaper for a nephew. So there was no actual credible evidence that the plaintiff, the decedent, had used talc in the manner in which the plaintiff's experts say talc needs to be used to allegedly cause ovarian cancer. So I think this is important because one of the arguments plaintiffs make in their brief, and I'll wrap up shortly, one of the arguments appellants make in their brief is that if there is an even trial, if the evidence looks even, and then there's a bunch of errors, then perhaps that is a ground for reversal. But here, it's really important to understand that the evidence was not even at all. There was incredibly flimsy evidence, and that is why, despite devastating sanctions against my client, we still prevailed. And the decedent's own doctor testified at trial that she had never discussed talc with the decedent and that she did not believe talc caused the decedent's death. So this was not, I want to make it really clear because I think it's important, this is not a trial that was close and somehow this, you know, tipped the jury over the edge. This is a trial where the evidence was strongly in favor of the defendant, and despite really, really harsh sanctions issued by the trial judge, including a finding of contempt that, as you know, this court reversed, but the jury did not know that. The jury was told that we and the witness were in contempt. Jane Jay was still able to prevail because of the evidence that did come in and that was properly before the jury. Both sides agree the standard of review is abuse of discretion. What specific decision of Judge Coker, or is it the denial of a motion from the trial? Is that the single decision of Judge Coker, or were there other issues during trial? That was a post-trial motion from the trial. My understanding is that opponents are only challenging the judge. I'm sorry, I didn't mean to interrupt. I thought you were going to ask a question. Were there other decisions you're asking us to consider under the abuse of discretion standard? My understanding is that opponents are only challenging the motion for a trial. Thank you. Thank you. Thank you for your time. Let's start with the question I just asked her. Is that the decision of Judge Coker that you're asking us to consider under abuse of discretion? Is it the denial of a motion from the trial? Yes, and for all the reasons that we raised in the motion for new trial and argued at the hearing of the motion for new trial. I do want to address a few things made by my opposing counsel, and that is this was a closely contested, hotly contested three-week trial. Johnson & Johnson apparently does not like circumstantial evidence. However, pages 10 through 15 of the reply brief, I went into some detail to detail various witnesses, including Sharon Carney, the younger sister that she referred to, and Jesse Carney, and the plaintiff's retained expert witnesses, who clearly emphatically testified that the amount of times that the direct evidence and circumstantial evidence that Elizabeth Briscoe utilized in her private areas, Johnson's maybe upon her on a consistent basis, would more than tip the scales under the prevailing peer-reviewed literature to have an association or quantization of usage and the development of ovarian cancer. That is clear from the multiple transcripts we have for this trial. The Johnson & Johnson defense was in large part based on attacking the usage evidence, but time and time again we saw, for example, Dr. Godleski, who is a Harvard-trained pathologist, who found calc particles in the pathology in the ovaries of Elizabeth Briscoe. And that's emphatic actual evidence, actual evidence in the body of the deceased of the very product that's in question in this case. And I can tell you, being there on the ground, this was a hotly contested case. The jury was absolutely listening to the testimony of Dr. Godleski and other plaintiff's experts. This was not, to use the football terminology, a blowout game. This was a hotly contested and closely contested three-week trial. We believe strongly that if there is a decision by new judges, new justices, that there was waiver or forfeiture on both, that the Plain Air Doctrine under Rule 366 does entitle the plaintiff here to a new trial based on the combined brazen no-show in the face of the company witness to not have to face continued cross-examination live in front of the jury on the one hand, and the affront to Judge Colker and the St. Clair County System on the other hand. Those two elements are clearly met here under the evidence in a big record, and we would respectfully and humbly request that that relief be granted to the appellant, Colleen Cadigan, the Executrix of the Estate of Elizabeth Driscoll. Thank you. Thank you.  Thank you. Thank you. We appreciate your arguments in the sense of the record of the case is very lengthy and intensive, and we'll take the matter under advisement to issue a decision in due course. Thank you. Thank you.